IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**REALTIMEZONE, INC.,**

      **Plaintiff,**

vs.                                                                              **No.  09cv0630 MCA/DJS**

**HALLIBURTON ENERGY**
**SERVICES, INC.,**

      **Defendant.**

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** is before the Court on Halliburton Energy Services, Inc.'s Motion for Entry of Protective Order **[Doc. No. 45]** filed on December 11, 2009, and fully briefed on January 22, 2010.  In its motion, Halliburton Energy Services, Inc. (Halliburton) seeks a two-tiered protective order limiting disclosure of some of its commercially sensitive information to RealTimeZone, Inc.'s (RTZ) counsel only.  Halliburton contends that disclosure of this information to RTZ's employees or CEO would be detrimental to it.  Having reviewed the motion, the parties' pleadings, and the applicable law, the Court will grant the motion in part.

**I.  Background**

In August 2002, the United States Patent and Trademark Office issued Patent No. 6,439,310 B1, entitled "Real-Time Reservoir Fracturing Process," for RTZ and the United States Department of Energy's co-developed process for hydraulic fracturing of subterranean reservoir formations in real time (the "Patented Process").  Compl. ¶5. RTZ has the exclusive rights to license the Patented Process and sue for patent infringement pursuant to the Exclusive Patent

Agreement between RTZ and the United States Department of Energy.  *Id.* ¶6; Ex. A.  RTZ registered the Patented Process in Brazil, Venezuela, Great Britain, and Canada.  *Id.* ¶7.

On January 1, 2001, RTZ licensed the Patented Process to Halliburton pursuant to a License Agreement between RTZ and Halliburton.  *Id.* ¶8; Ex. B.  Halliburton marketed the Patented Process in various oil and gas trade publications and at international oil and gas industry conferences and expositions.  *Id.* ¶9.  Additionally, Halliburton has used, offered to sell, and sold the Patented Process in the United States, specifically in New Mexico.  *Id.* ¶10.  Nonetheless,  Halliburton has denied using the Patented Process since the inception of the License Agreement and claims it does not owe RTZ any royalties.  *Id.* ¶11; Ex. C.

In the Fall of 2005, RTZ exercised its right under the Lease Agreement to audit Halliburton's use of the Patented Process.  *Id.* ¶12.  However, Halliburton refused to provide RTZ with information on Halliburton's use of the Patented Process in any country outside the United States as RTZ had requested.  Even though the License Agreement does not contain a requirement that RTZ travel to foreign countries to conduct audits, Halliburton informed RTZ it would have to do so.  RTZ contends Halliburton took this position to prevent RTZ from discovering that Halliburton had used, offered to sell, and sold the Patented Process in order to avoid paying RTZ royalties under the Lease Agreement.

During the Fall 2005 audit, RTZ discovered, and Halliburton admitted, that Halliburton had used the Patented Process and owed RTZ royalties of some unspecified amount under the Lease Agreement.  *Id.* ¶ 13.  However, Halliburton continues to report quarterly to RTZ that it has not used the Patented Process and has not paid any royalties under the Lease Agreement.  *Id.*

2

¶¶ 13, 14.  On June 26, 2009, RTZ filed its Complaint for Breach of Contract, Fraud, and Patent Infringement (Doc. No. 1).[1]

## II.  Discussion

Both parties agree that some form of protective order is needed.  *See* Davis Decl., Ex. D, ¶6.  However, Halliburton contends it expects to supply RTZ with (1) proprietary information about its past, current, and potential future well stimulation techniques and technology, (2) global pricing information, and (3) customer-specific discount information.  Halliburton claims this commercially sensitive information in the hands of RTZ's employees or George Scott, RTZ's President, would "unfairly harm Halliburton's marketplace position."  Def.'s Mot. Entry of Protective Or. at 2.  Accordingly, Halliburton moves the Court for a two-tiered protective order limiting disclosure of this commercially sensitive information to RTZ's counsel only.  RTZ opposes a two-tiered protective order.

Under Halliburton's proposed two-tiered protective order, the first tier, designated as "Confidential," allows disclosure to certain RTZ employees, including Scott, and outside counsel, but it prohibits wide public disclosure.  *Id.* at 3; Ex. A (Halliburton's Proposed Protective Order).  In addition, Halliburton's proposes a "Highly Confidential" designation that would allow only RTZ's counsel and experts to view certain confidential information that constitutes

> [P]roprietary financial or technical or commercially sensitive competitive information that the Producing Party maintains as highly confidential in its business, including information obtained from a nonparty pursuant to a current Nondisclosure

---

[1] On September 16, 2009, Halliburton filed its Motion for Judgment on the Pleadings with Respect to Count II (Fraud) of Plaintiff's Complaint.  (Doc. No. 19).  On October 5, 2009, the Court entered an Agreed Order Granting Motion for Judgement on the Pleadings with Respect to Count II (Fraud) of Plaintiff's Complaint.  (Doc. No. 29).

3

> Agreement ("NDA"), information relating to future products not yet commercially released, strategic plans, technical documents that would reveal trade secrets, and settlement agreements or settlement communications, the disclosure of which is likely to cause harm to the competitive position of the Producing Party.

*Id.* Any protected material not meeting the requirements to be designated "Highly Confidential" may be designated as Confidential. *Id.* RTZ argues that Halliburton has not met its burden of establishing good cause for its proposed "Highly Confidential" designation.

Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure provides, in relevant part, that for good cause shown, the Court may "issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense including . . . that a trade secret or confidential research, development, or commercial information not be revealed or be revealed only in a specified way." FED.R.CIV.P 26(c)(1)(G). "A party seeking to resist disclosure under [Rule 26(c)(1)(G)] must first establish that the information sought is trade secret or other confidential research, development, or commercial information and then demonstrate that its disclosure might be harmful." *MGP Ingredients, Inc. v. Mars Inc.*, 245 F.R.D. 497, 500 (D.Kan. 2007)(citing *Centurion Indus., Inc. v. Warren Steurer & Assocs.,* 665 F.2d 323, 325 (10th Cir. 1981)). Once these requirements are met, the burden shifts to the party seeking discovery to establish that the disclosure of trade secrets is relevant and necessary to the action. *Id.* Finally, the Court must balance the need of the party seeking discovery of the trade secrets and confidential information against the opposing party's claim of injury resulting from the disclosure. *Id.*

Halliburton has the burden of proving the competitive harm that would befall it by virtue of its disclosure of sensitive information to RTZ 's employees, specifically Scott. *Centurion Indus., Inc*., 665 F.2d at 325. To meet it burden, Halliburton is "required to make a particular

4

and specific demonstration of fact, as distinguished from stereotyped and conclusory statements." *MGP Ingredients, Inc.*, 245 F.R.D. at 501 (internal quotations omitted)(quoting *Gulf Oil Co. V. Bernard*, 452 U.S. 89, 102 n.16, 101 S.Ct 2193 (1981)).

In support of its motion for a two-tiered protective order, Halliburton claims RTZ is its direct competitor, and thus the risk of competitive harm to it is acute. Def.'s Mot. Entry of Protective Or. at 7. To establish RTZ is a direct competitor, Halliburton claims RTZ develops and licenses oil services technology. *Id.* at 2. Halliburton also contends Scott is listed as the inventor of the patent at issue and is RTZ's "strategic decision maker with respect to RTZ's pursuit and negotiation of licensing agreements." *Id.* at 8. According to Halliburton, Scott's role as an inventor and RTZ's CEO creates greater risk of harm that necessitates the type of protection it seeks. Halliburton also claims RTZ seeks to license the patent at issue and other patented technologies to oil services companies like Halliburton. Finally Halliburton claims Scott regularly speaks and consults on oil well technology and works with other oil services companies that provide services similar to those regularly provided by Halliburton. *Id.* at 2.

Based on these representations, Halliburton argues, "RTZ would be able to unfairly improve its own technology by anticipating Halliburton's technology and increasing functions in its own technology while saving on the cost of research and development – a critical advantage in patenting and licensing of oil and gas well stimulation technology." *Id.* Additionally, Halliburton claims that access by RTZ to its "cost and pricing information, identity of potential licensees, and information about the types of fracturing solutions sought by customers would allow RTZ to unfairly compete with Halliburton in promoting its own well stimulation technology over Halliburton's to potential licensees." *Id.* at 8.

In response to Halliburton's claims, RTZ asserts it is not Halliburton's competitor and "cannot compete with Halliburton in the oil field services industry given RTZ's two-man size and lack of any equipment to perform such services." Pl.'s Resp. at 4; Scott Decl.; Ex. A, ¶¶ 3, 8-9. Additionally, RTZ states it does not seek to license the patent at issue to Halliburton's competitors, and Scott does not regularly speak and consult on oil field technology. *Id.*, Scott Decl.; Ex. A, ¶¶ 7, 11.

RTZ argues that Halliburton's request to keep information and documents from Scott will impair RTZ's ability to prepare its case because it intends to rely on Scott for the majority of testimony pertaining to the construction of the claims in the 310 Patent and infringement of the 310 Patent by Halliburton's stimulation processes. *Id.* at 5; Scott Decl.; Ex. A, ¶13. RTZ maintains that without access to technical data pertaining to Halliburton's stimulation processes, Scott cannot effectively assist it in preparing its case. *Id.* at 6. RTZ contends this is so because Scott "cannot adequately assess RTZ's potential damage without access to information regarding Halliburton's gross number of and revenue from frac jobs from which to extrapolate a damages model based on the royalty schedule in the License Agreement." *Id.* at 6; Scott Decl.; Ex. A, ¶14. RTZ also contends that Halliburton's "Confidential" designation is enough to protect its confidential information from inappropriate use and disclosure beyond this lawsuit. To require more, RTZ argues, would force it to hire outside experts to do this work which would cause RTZ to incur unnecessary expense.

The Court is not convinced that RTZ is a direct competitor of Halliburton. RTZ submitted Scott's Declaration to establish it was not a direct competitor of Halliburton. Specifically, Scott declared there were no other licensees of the patented process besides Halliburton in 2001, RTZ did not seek to license the patented process to Halliburton's

competitors, RTZ did not provide any oil field services in competition with Halliburton, RTZ did not own any equipment with which to provide oil field services in competition with Halliburton, Scott and RTZ did not have any technologies under development applicable to the oil field services industry, and Scott did not consult in the area related to oil well technology or written a paper about any other oil well technology since the 310 patent work.  *See* Pl.'s Resp.; Ex. A, Scott Decl. ¶¶6-11.

In its reply, Halliburton failed to refute RTZ's assertions that it was not Halliburton's direct competitor.  Thus, Halliburton has not carried its burden of proving the competitive harm that would befall it by virtue of its disclosure of sensitive information to Scott.  Although Halliburton submitted the Declaration of Dean Prather, an employee of Halliburton, to support its position, Mr. Prather's Declaration only established the need for a protective order but not necessarily a two-tiered protective order that may well hamper RTZ's ability to prove its claims as RTZ would have to incur unnecessary expenses if it were required to hire outside experts.

Moreover, as the co-inventor of the Patented Process at issue in this case and as President of RTZ, Scott is the most knowledgeable person about the issues in this case.  *See Medtronic Sofamor Danek, Inc., v. Michelson*, No. 01-2373, 2002 WL 33003691 (W.D. Tenn. Jan. 30, 2002)(finding two-tiered protective order not necessary as to inventor of technology at issue as this fact alone made inventor "uniquely qualified" to determine what devices and methods are covered by the license agreement in dispute).  Scott should be allowed to assist in the prosecution of RTZ's suit on his Patented Process.  *See THK America, Inc. v. Nippon Seiko*, 141 F.R.D. 461 (N.D. Ill. 1991)(denying proposed provision of protective order in patent infringement litigation which would have precluded patent holder from conferring with its own president, who was inventor of products at issue, from viewing alleged infringers' confidential

documents); *MPG Ingredients, Inc., v. Mars, Inc.*, 245 F.R.D. 497 (D. Kan. 2007)(two-tiered protective order not required in patent holder's lawsuit, prohibiting access could have impaired patent holder's ability to prosecute its claims).

*Safe Flight Instrument Corp. v. Sundstrand Data Control, Inc.*, 682 F.Supp. 20 (D. Del. 1988), the case Halliburton relies upon to support its claim that RTZ is a direct competitor, is distinguishable from this action.  In *Safe Flight*, the court granted Sunstrand motion for a protective order limiting disclosure to trial counsel and to approved outside experts.  The court determined that Leonard Greene, Safe Flight's President and founder, would not be allowed to examine Sundstrand's scientific documents because he was Sundstrand's *direct competitor*.  The court noted Greene ranked as a preeminent aeronautic engineer who had received more than sixty aeronautic patents and "actively plie[d] aeronautic engineering." *Id.* at 21.  The court found the potential for abuse and competitive loss was real because, "Safe Flight and Sunstrand *directly compete* in the market for avionics equipment . . . ." *Id.* at 22.  The court questioned Greene's "human ability during future years of research to separate the applications he has extrapolated from Sundstrand's documents from those he develops from his own ideas." *Id.*

The second case Halliburton relies upon is *Northbrook Digital, L.L.C. v. Vendio Services, Inc.*, 625 F.Supp.2d 728 (D. Minn. 2008).  Halliburton cites *Northbrook* for the proposition that "in patent cases in which the plaintiff 'is involved in prosecuting patents that are related to the defendants (sic) business, federal courts routinely limit the plaintiff's access to the defendant's technical trade secrets.'"   Def.'s Mot. Entry of Protective Or. at 6.  Halliburton then claims "this is precisely the situation here, and thus the standard two-tier restriction is warranted." *Id.* at 7.  However, as RTZ points out, Halliburton does not substantiate in any way that RTZ or Scott are

8

"involved in prosecuting patent applications that relate to Halliburton's business and to the patents in suit." Pl.'s Resp. at 5.

In *Northbrook,* the district court described Northbrook as a one-man operation run by Mark A. Wolfe, with Wolfe wearing many hats. Wolfe was (1) the inventor of the patents in suit, (2) an attorney licensed to practice before the United States Patent and Trademark Office (PTO) who prosecuted his own patents (including the patents in suit and related continuation patents), and (3) he was the owner of Northbrook and a handful of other small entities. *Id.* at 731. Additionally, Wolfe planned to testify both as an expert witness and as a fact witness at trial. He also had entered an appearance as litigation counsel on behalf of Northbrook.

Vendio filed, *inter alia*, a motion for a protective order arguing that, although Wolfe had entered an appearance for Northbrook, nonetheless, he should be denied access to certain of its confidential information designated "Confidential– Attorneys' Eyes Only." *Id.* at 732. The magistrate judge granted Vendio's motion and recommended a protective order be entered under which Wolfe would be denied access to Vendio's confidential information designated "Confidential– Attorneys' Eyes Only." Northbrook filed objections to this recommendation.

Noting that the key issue in many patent cases was whether the litigants were direct competitors and whether the person or persons who would be denied access to information under a protective order were involved in a party's competitive decisionmaking, the district court sustained Northbrook's objection to the magistrate judge's finding that "because Northbrook and Vendio have a 'shared interest in a single patented technology' they are competitors." *Id.* at 738. The district court opined that this definition of competition was too broad and found Northbrook and Vendio were not direct competitors in output markets. The district court noted,

9

> It is true, as Judge Graham notes, that the value of what Northbrook sells– licenses to its patents– is a function of the value of the business of a potential licensee such as Vendio.  But this is not a reason to prevent Northbrook from learning about Vendio's costs, customers, or profitability.

*Id*. at 739.   However, the district court sustained Vendio's objection to the magistrate judge's finding that "Northbrook is not currently engaged in patent prosecution" and granted Vendio's motion for a protective order with respect to Vendio's confidential technical information.  *Id*. at 741.  The district court then found that Vendio and Northbrook competed in a limited way in the input market for software and business methods to facilitate online advertising and marketing.  The district court relied upon the evidence submitted by Vendio in support of its motion for protective order.

To counter Wolfe's characterization of his patent-prosecution activities and his declaration that "minimized the scope of his activities before the PTO," Vendio submitted three published patent applications by Wolfe that were currently pending before the PTO. *Id.* at 742.  Vendio also submitted evidence showing Wolfe had fifteen patent applications related to the patents in suit currently pending before the PTO, seven of which were filed after Northbrook filed the lawsuit.  In this case, Halliburton has not submitted any evidence to support its claim that RTZ is involved in prosecuting patents that are related to Halliburton's business.  Accordingly, the Court finds that, although a protective order is warranted, a two-tiered protective order is not warranted.

On October 30, 2009, RTZ's counsel agreed to the protection for "confidential" documents contained in paragraph 10 of Halliburton's Proposed Protective Order. Pl.'s Resp.; Ex. D, Davis Decl. ¶6.   Pending the Court's ruling on Halliburton's motion for entry of protective order, the parties have been operating under Halliburton's Proposed Protective Order.

The Court will grant Halliburton's motion for protective order but will strike the "highly confidential" designation. Halliburton shall submit the revised protective order to the Court for review.

**NOW, THEREFORE,**

**IT IS HEREBY ORDERED** that Halliburton Energy Services, Inc.'s Motion for Entry of Protective Order is granted in part.

**IT IS FURTHER ORDERED** that Halliburton submit a revised protective order to the Court five (5) days from the entry of this Memorandum Opinion and Order.

_____
**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**